UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| STEPHANIE SCHEEL and MRW HOLDINGS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 3: 11-17-DCR |
| V. | ) ) ) | |
| STEVE HARRIS and GREGG BROOKS, | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) ) | |

*** *** *** ***

This matter is pending for consideration of several motions.  [*See* Record Nos. 107, 108, 111, 114.]  Plaintiffs Stephanie Scheel and MRW Holdings, Inc. ("MRW") assert that they are entitled to partial summary judgment regarding Defendant Steve Harris's liability on the underlying defamation claims they have asserted against him.  Additionally, they request a determination that they are entitled to a jury instruction on punitive damages at trial. Conversely, Defendants Harris and Gregg Brooks seek summary judgment on the defamation and conspiracy claims asserted against them.

For the reasons explained below, the Court will deny the plaintiffs' motions for partial summary judgment.  However, the Court will grant Brooks's motion.  Harris's motion will also be granted with regard to the plaintiffs' conspiracy claim.

-1-

## I.      Background

This case arises from an ethics complaint that Harris filed with the American Institute of Professional Association Group Insurance Administrators ("AIPAGIA") regarding MRW and Scheel.  The AIPAGIA "serves as a resource for best practices in the group association industry." [Record No. 123, p. 8] It is a self-governed organization, with a "membership/ethics chair who is tasked with overseeing any ethical issues raised within the organization." [*Id.*] Harris and MRW are members of the AIPAGIA.  Brooks, who is also in the business of providing group insurance, is not a member of the association.

MRW is a Virginia-based insurance broker "focusing on group association insurance plans." [*Id.*, p. 3]  It was founded in 1982 by Michael R. Ward ("Mr. Ward"), Stephanie Scheel's father. [*Id.*]  Scheel worked for MRW from 1999 to 2011.  Additionally, she "held a number of roles at MRW and acceded to Vice President in 2005." [Record No. 107-1, p. 3] And from 2000 to 2010, Scheel attended AIPAGIA meetings on MRW's behalf.

Beginning in 1997, Mr. Ward, Harris, and Brooks formed several partnerships "selling insurance products wherein the three men would share commissions generated from the products." [Record No. 108-1, p. 4] In the "late 1990s," Mr. Ward, Brooks, and Harris "entered into an informal partnership whereby they agreed to evenly share commissions from any insurance business they were able to generate in the Washington, D.C. area." [*Id.*, pp. 3-4]  In 2001, they obtained an account selling health insurance to the Democratic National Committee ("DNC").  Pursuant to the agreement, MRW was "broker of record" on the account, while Mr. Ward, Brooks, and Harris shared "equally in the commissions from the account." [*Id.*, p. 4]  The

-2-

three also entered into an agreement with Brad Marshall, Chief Financial Officer for the DNC, whereby Marshall would be paid a consulting fee of $1,000 per month.  In exchange, Marshall agreed to "use his contacts to generate business."  [*Id.*]  They "decided to use the monthly DNC commission to pay Marshall his $1,000 consulting fee, and to also pay Ms. Scheel $1,000 per month to service the DNC account."  [*Id.*]  The DNC account was lucrative.  By 2008 the commissions were roughly $120,000 per year.  [*Id.*]

In August 2004, Mr. Ward joined with Brooks and Harris in another venture: Worldwide Benefit Services, LLC ("WBS").  WBS "sold insurance products known as the Travel Assistance program and ID Theft Assist program."  [Record No. 114-1, p. 2]  The original partners were Harris and Brooks, who each held a twenty-five percent interest, and MRW, which held a 50% interest.  [Record No. 123, p. 6]  In October 2005, Chris Ward — Mr. Ward's son — became a member "by acquiring one-half of MRW's 50% interest in WBS."[1]  [*Id.*]

Mr. Ward passed away in 2008, and his wife, Peggy Ward ("Mrs. Ward"), took over as President of MRW.  However, due to questions of succession, a dispute arose "over the terms of the WBS Operating Agreement providing for compensation and the role of MRW in WBS." [Record No. 114-1, p. 2]  During this time, the relationship between Scheel, Harris, and Brooks began to deteriorate.  In May 2009, Scheel sent an update on the DNC account to Harris, Brooks, and Mrs. Ward.  Harris responded to Sheel by directing that she "please stop all communication

---

[1]    Harris contends that it was not until later that Chris Ward explained to him the nature of this transaction.  Harris believed that he was entitled to a percentage of the funds with which Chris Ward purchased his partnership share.  [Record No. 130, p. 14]

with me.  In light of the current situation with MRW and WBS I want no communication, just send me my check!"  [Record No. 123-7, p. 13]

During this period, the parties also became concerned about the propriety of the fee agreement with Marshall.  The insurance industry prohibits "a non-licensed individual [from] receiving a commission, or kick back, for referring an account."  [Record No. 123, p. 5 n.13] After Mr. Ward's death, "MRW's accountants suggested that Ms. Scheel locate the consulting fee agreement so as to ameliorate any concerns regarding the payments to Marshall."  [*Id.*] MRW discontinued the payments after the consulting fee agreement was not produced.  [Record No. 107-11, pp. 16-17]  On January 15, 2010, Harris and Brooks resigned from the DNC account.

After Harris and Brooks withdrew from the DNC account, "Harris asked Brooks to summarize the account and his dealings with Stephanie."  [Record No. 111-1, p. 4]  Brooks did so in an e-mail dated March 22, 2010, which Harris attached to the ethics complaint that he filed on March 29, 2010.  [Record No. 107-8, pp. 4-23]  Harris lodged the complaint against MRW and Scheel to "ask that their membership be terminated" on the grounds that they "have acted unprofessionally, illegally, stolen monies from partners, . . . and [committed] numerous acts that could hurt the reputation and integrity of AIPAGIA."  [*Id.*, p. 4]  The statements made in the ethics complaint form the basis for the plaintiffs' defamation claims.

Scheel and MRW filed their original complaint in Virginia state court on December 22, 2010.  [Record No. 3, p. 1]  They asserted claims for defamation and civil conspiracy against Harris and Brooks.  Harris removed the action to the United States District Court for the Western

District of Virginia on March 2, 2011, and filed a motion for improper venue and lack of personal jurisdiction. [*Id.*] On March 23, 2011, while this motion was still pending in Virginia, the plaintiffs filed a second, essentially identical, complaint in the Eastern District of Kentucky. [*Id.*; *see* Record No. 1]  Harris's motion to dismiss was granted by the Western District of Virginia on June 28, 2011.  [Record No. 27, p. 2] Following a period of discovery, the parties filed various motions for summary judgment which are now ripe for review.  [Record Nos. 107, 108, 111, 114]

## II.    Standard of Review

Summary judgment is appropriate when a party demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party.  That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986); *see Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).

A party moving for summary judgment bears the burden of showing conclusively that no genuine issue of material fact exists.  *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008). In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Additionally, the nonmoving party must do more than cast some "metaphysical doubt" on the material facts.  *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002) (citing *Matsushita*, 475 U.S. at 586).  Instead, he or she must present "significant probative evidence" of a genuine dispute in order to defeat the motion for summary judgment.  *Id.*

## III.    Legal Analysis

A federal court, sitting in diversity, must apply "the law, including the choice of law rules, of the forum state."  *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).   Kentucky's choice of law principles dictate that, for actions sounding in tort, "'significant contacts' . . . permit the application of Kentucky law."  *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009) (quoting *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972)).  Here, there are significant contacts with Kentucky because the plaintiffs' claims stem from an "ethics complaint . . . prepared by a Kentucky resident in Kentucky."  [Record No. 107-1, p. 16 n.86]  As a result, the Court will apply Kentucky law to the plaintiffs' defamation and conspiracy claims.

### A.    Scheel's and MRW's Motions for Summary Judgment

Scheel and MRW assert that are entitled to partial summary judgment regarding their defamation claims against Harris.  The plaintiffs contend that they have each established a prima facie case of defamation.  Harris does not seriously dispute this point.  He argues, however, that his statements are not actionable because they are "true, substantially true or merely opinion."  [Record No. 130, p. 12]  Alternatively, he maintains that the ethics complaint which forms the

basis for this action was privileged as a "matter of common interest between Harris and AIPAGIA." [*Id.*, p. 15] The plaintiffs also maintain that they are entitled to a punitive damages instruction at trial regarding their defamation claims against this defendant.

### 1.    Elements of Defamation

To make out a claim for defamation, a plaintiff must establish the following four elements: (i) defamatory language; (ii) about the plaintiff; (iii) which is published; and (iv) which causes injury to reputation. *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004). Regarding the first element, a writing is defamatory if it tends to bring a person into public hatred, contempt or ridicule, cause the person to be shunned or avoided, or injure the person's business or occupation. *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 884 (Ky. 1981). More specifically, "a written publication is [defamatory] which falsely charges or imputes dishonesty or engagement in fraudulent enterprises of such a nature as reflects upon the character and integrity of a person and to subject [her] to the loss of public confidence and respect." *Yancey v. Hamilton*, 786 S.W.2d 854, 858 (Ky. 1990) (quoting *Smith v. Pure Oil Co.*, 128 S.W.2d 931, 932 (Ky. 1939)). As for the third element, the term "'publication' is a term of art, and defamatory language is 'published' when it is intentionally or negligently communicated to someone other than the party defamed." *Stringer*, 151 S.W.3d at 793.

Finally, the "proof necessary to demonstrate an injury to reputation varies depending upon the characterization of the defamatory language." *Id.* Defamatory language may be actionable per se or per quod. "In the former class, damages are presumed and the person defamed may recover without allegation or proof of special damages. In the latter class,

-7-

recovery may be sustained only upon an allegation and proof of special damages." *Hill v. Evans*, 258 S.W.2d 917, 918 (Ky. 1953). Statements that are considered defamatory per se include "those which attribute to someone a criminal offense, . . . or conduct which is incompatible with [her] business, trade, profession, or office." *Gilliam v. Pikeville United Methodist Hosp. of Ky., Inc.*, 215 S.W.3d 56, 61 (Ky. Ct. App. 2007).

### i.    Scheel

Scheel identifies as defamatory the following comments from Harris's ethics complaint: (1) "Harris's statement that Brad Marshall said he felt blackmailed by Ms. Scheel"; (2) "Harris's statement, '[n]ow she gets the $120,000 all to herself, not bad for a [customer service representative ("CSR")]'"; and (3) "Harris's statement, 'in my opinion you are sick and need help.'"[2] [Record No. 107-1, p. 14] Scheel contends that Harris's statements are defamatory per se because they "completely undermine [her] professional competence and integrity." [*Id.*, p. 17]

The first statement would tend to prejudice Scheel in her profession. Thus, it is considered to be defamatory per se. Scheel argues that the second communication is also defamatory per se because it belittles her position at MRW. [*Id.*] The Court disagrees, and instead finds the comment to be defamatory per quod, because "comprehension of the defamatory nature of the written . . . words requires extrinsic evidence of context or circumstances." *Stringer*, 151 S.W.3d at 795. Harris may have misstated Scheel's job title, but without other proof the Court cannot conclude that he implied that she was unfit for her

---

2       These are the statements specifically addressed in Scheel's motion for summary judgment. Her Complaint lists several other allegedly defamatory statements, including statements made outside the ethics complaint. [*See* Record No. 1 ¶¶ 25-27.]

-8-

profession by doing so.  In the same way, calling a doctor "nurse" may offend the doctor because of the considerable time and effort she spent attending medical school, but the statement does not necessarily call into question his or her ability to competently practice medicine.  The third comment is also defamatory per quod.  Further, regarding the second element, there is no dispute that Harris's statements were about Scheel.

Having concluded that Scheel has established the first two elements of her defamation claim, the Court must consider whether the statements were published.  When considering defamation claims, Kentucky courts rely on the Restatement (Second) of Torts, which provides that "[it] is not necessary that the defamatory matter be communicated to a large or even substantial group of persons.  It is enough that it is communicated to a single individual other than the one defamed."  Restatement (Second) of Torts § 577 cmt. b. (1977).  As a result, the ethics complaint satisfies the publication requirement.

Finally, regarding Harris's defamatory per quod statements, Scheel must present proof of "special damages, *i.e.*, actual injury to reputation" to succeed at the summary judgment phase. *Stringer*, 151 S.W.3d at 795.  However, she has failed to fulfill her initial burden regarding this element.[3]  Because the Court has determined Harris's "blackmail" statement to be defamatory per se, Scheel need not affirmatively prove the special damages caused by that comment.

---

3       Scheel argues that she "could easily satisfy" the burden of establishing special damages. [Record No. 107-1, p. 17 n.87]  She asserts that deposition testimony reveals that "there were several negative remarks about [Scheel]" after the ethics complaint was filed, and some members of AIPAGIA "stated that they hope MRW and Scheel 'never come back.'"  [*Id.*]  This evidence, standing alone, is insufficient to show that no genuine issue of fact remains for trial because it does not resolve the issue of causation.  Thus, the question of actual injury to Scheel's reputation "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

Therefore, Scheel has established the elements of a defamation claim with respect to the "blackmail" statement only.

### ii.    MRW

MRW identifies as defamatory the following statements from Harris's ethics complaint: (1) "I have enclosed supportive information that clearly demonstrates [MRW has] acted unprofessionally, illegally, stolen monies from partners, misleading and false accusations against me personally and numerous acts that court hurt the reputation and integrity of AIPAGIA"; (2) "this demonstrates how far MRW will go to extort additional monies from WBS.  I am sad to say that Mike Ward and MRW have literally stolen monies from partners"; and (3) "as equal partners Mike and/or MRW stole $5,000 each from Steve [Harris] and Gregg [Brooks]."[4] [Record No. 108-1, p. 7 (emphasis omitted, alterations in original); *see also* Record No. 108-5, p. 13]

Like Scheel, MRW has established a prima facie case of defamation against Harris.  His statements in the ethics complaint were defamatory per se because they "attribute to MRW a criminal offense."  [Record No. 108-1, p. 16 (internal quotation marks omitted)]  Furthermore, there is no dispute that Harris's statements were about MRW because they referred to the business by name, and the ethics complaint clearly satisfies the requirement of publication because it was submitted to a third party.  Finally, because the Court finds Harris's statements to be defamatory per se, MRW has also met its burden with regard to the fourth element, and

---

4    These are the statements specifically addressed in MRW's motion for summary judgment.  The Complaint lists several other allegedly defamatory statements, including statements made outside the ethics complaint.  [*See* Record No. 1 ¶ 25.]

MRW need not affirmatively prove the "actual injury to [its] reputation." *Stringer*, 151 S.W.3d at 795.

## 2.    Affirmative Defenses

Harris raises three defenses to the plaintiffs' defamation claims. He contends that, when considered in proper context, his statements express his own opinion. [Record No. 130, pp. 5-12] Harris also asserts that his statements concerning Scheel and MRW were mere opinions or "rhetorical hyperbole." [*Id.*, p. 4] Finally, he argues that his ethics complaint is entitled to a qualified privilege because it was a "matter of common interest between Harris and AIPAGIA." [*Id.*, p. 15]

### i.    Truth

Harris asserts that several of his statements about MRW were true. And he properly contends that truth is an absolute defense to a defamation claim, even where the statements were made maliciously. *Stringer*, 151 S.W.3d at 796. The Court must deny the plaintiffs' motion for summary judgment "if the evidence supports, without contradiction or room for reasonable difference of opinion," the truth of the defamatory communications. *Herald Publ'g Co. v. Feltner*, 164 S.W. 370, 372 (Ky. Ct. App. 1914). The "falsity of defamatory words is presumed." *Stringer*, 151 S.W.3d at 796. Thus, the burden is on the defendant to prove the truth of his statements by a preponderance of the evidence. *Id.*

In his response, Harris maintains that the "allegedly defamatory statements regarding theft and MRW stealing from its partners . . . [were] true based on the information he was provided by his partner, Chris Ward." [Record No. 130, p. 14] In other words, Harris argues

that he had a reasonable belief in the truth of the ethics complaint allegations and, therefore, the statements are not actionable.  He admits, however, that the accusation was not actually true. [*See Id.*, p. 15 (indicating that he "withdrew his statements in the ethics complaint with respect to this matter" when Chris Ward explained the situation to him).]

Defamation is essentially a strict liability tort.  *See Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 273-74 (Ky. Ct. App. 1981).  However, the standards differ when the subject of the defamatory statements is a public figure or involves a matter of public concern.  If a defendant speaking about a "matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990).  "Similarly, where such a statement involves a private figure on a matter of public concern, a plaintiff must show that the false connotations were made with some level of fault." *Id.*  However, in an action involving private parties and matters of private concern, no showing of fault is required.  *Calor v. Ashland Hosp. Corp.*, No. 2007-SC-000573-DG, 2011 WL 4431143, at *7 (Ky. Sept. 22, 2011) ("For the average citizen who leads a private life, however, published statements that are false and injurious and made with mere negligence are usually sufficient for recovery.").  Thus, Harris's assertion that he held a reasonable belief in the truth of his allegation that MRW committed theft is insufficient to provide him a defense to MRW's defamation claims.

####        ii.        Opinion

As noted previously, Harris also contends that his statements, "when construed as a whole in their proper context, were merely opinion and, thus, not actionable." [Record No. 130, p. 2] Kentucky Courts have adopted the approach to the fact-opinion distinction set out in Restatement (Second) of Torts:

> The Restatement distinguishes between "pure" opinion and "mixed" expressions of opinion. Pure opinion, which is absolutely privileged, occurs where the commentator states the facts on which the opinion is based, or where both parties to the communication know or assume the exclusive facts on which the comment is clearly based. In contrast, the mixed type "is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication."

*Yancey*, 786 S.W.2d at 857 (quoting Restatement (Second) of Torts § 566, cmt. b. (1977)).

The "determination of whether a statement constitutes fact or opinion is a question of law." *Seaman v. Musselman*, No. 2002-CA-001269-MR, 2003 WL 21512489, at *3 (Ky. Ct. App. July 3, 2003). Defamatory words "should be construed as a whole." *McCall*, 623 S.W.2d at 884. In other words, a defamatory statement must be considered "in the whole context of its publication." *Yancey*, 786 S.W.2d at 857.

Harris stated in his ethics complaint that Marshall "said he felt he was blackmailed into it and he didn't trust [Scheel] enough to know what she might do." [Record No. 107-8, p. 6] Harris contends that this is "a statement of opinion regarding the circumstances surrounding the fallout between MRW, WBS and Brad Marshall and the DNC account," and that his "use of the word 'blackmail' was merely hyperbole."[5] [Record No. 130, p. 5] Scheel maintains that the

---

5        Harris attempts to use his deposition testimony, as well as that of Marshall and Brooks, to show that the statement was an exaggeration. [Record No. 130, pp. 6-10] However, as the plaintiffs point out, the

statement is one "recalling a fact — i.e., Brad Marshall's statement about Ms. Scheel, which

further implies that Ms. Scheel committed blackmail." [Record No. 139, p. 7] The Court agrees

that the statement is factual in nature.  Harris's use of the word "blackmail," along with his

assertion that Marshall did not trust Scheel, was more than simply a "vigorous epithet used by

[a person] who considered [Scheel's] negotiating position extremely unreasonable." *Greenbelt*

*Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970).  Rather, the statement suggests knowledge

of a situation in which Scheel used a damaging piece of information against Marshall to get from

him what she wanted.  When considered in context — nestled in a paragraph that accuses Scheel

of using a fact she had known for some time to get out of paying Marshall his consulting fee[6] —

Harris's statement "could be found to imply that the speaker had particular and articulable

---

Court must consider the statement in its context as part of the AIPAGIA ethics complaint as a whole.  It may
not inquire into his subjective intentions.  *McCall*, 623 S.W.2d at 884 ("[A]lleged defamatory words must
be measured by their natural and probable effect on the mind of the average lay reader and not be subjected
to the critical analysis of the legal mind.")

6       The full paragraph reads as follows:

> The final straw came in December when [Scheel] asked [Marshall] for a copy of his health
> license on advice of her Attorney and Accountants.  When he said he didn't have a license
> and never had she "seemed" so surprised and said she couldn't pay him anymore. Obviously
> she knew he didn't have one when that is what she used to keep MRW getting paid 15
> months earlier.  She goes on to say [Marshall] was comfortable with it.  In reality he said he
> felt blackmailed into it and he didn't trust Stephanie enough to know what she might do.

[Record No. 107-8, p. 6]  The comment that Scheel's knowledge regarding Marshall's lack of a license "is
what she used to keep MRW getting paid 15 months earlier" [*Id.*], refers to his earlier assertion that, in July
2008, "Stephanie became quite upset and said . . . MRW is the one who could lose their license since they
are paying the CFO illegally and they deserve a full share" of the profits from the DNC account.  [*Id.*, p. 5]

reasons for believing" that Scheel engaged in coercive techniques to achieve her professional goals.[7]  *Yancey*, 786 S.W.2d at 858.

The second statement to which Scheel's motion refers (i.e., "Now [Scheel] gets the $120,000 all to herself, not bad for a CSR?"[8]) is also an assertion of fact which does not warrant the absolute privilege accorded to statements of pure opinion.  *See Yancey*, 786 S.W.2d at 857. However, Harris also argues that the statement was "substantially true." [Record No. 130, p. 12] He contends that this comment was not a statement about Sheel's title or position with MRW. Instead, it was "a characterization of her duties as they related to the DNC account."  [*Id.*, p. 11] Scheel counters that "Harris was trying to belittle Ms. Scheel in the eyes of her AIPAGIA peers by calling her a CSR when she was actually the Vice President of a company." [Record No. 139, p. 7]  However, Harris's intent is not at issue at this point of the Court's analysis.  The question is whether the statement, read in context, is true.

The Court concludes that, because Scheel was the Vice President of MRW, the statement was untrue.  As an initial matter, the doctrine of "substantial truth" was developed in the context of actions against newspapers reporting matters of public concern.  *See Bell v. Courier-Journal & Louisville Times Co.*, 402 S.W.2d 84, 87 (Ky. 1966) ("Where the defendant is a newspaper, the rule is that it is not to be held to the exact facts or to the most minute details of the

---

7    Webster's Ninth New Collegiate Dictionary (1983) defines "blackmail" as "extortion by threats esp. of public exposure or criminal prosecution."  *Id.*

8    Harris asserts that because there is no reference to this particular statement in Scheel's Complaint, she cannot use it to support her defamation claim now.  [Record No. 130, p. 11]  However, the Complaint referred to the entire ethics complaint, and the list of allegedly false statements in the plaintiffs' Complaint was explicitly non-exhaustive.  [*See* Record No. 1 ¶ 25 ("[F]alse statements made or re-published by Harris in the Ethics Complaint . . . included the following")]  The fact that this comment was not reproduced as a specific example in the body of the Complaint is not dispositive.

-15-

transactions that it reports.  What the law requires is that the publication be substantially true.”).

The doctrine does not apply to private citizens who are not reporting on matters of public

concern.  Even if it did, the statement is not substantially true because the doctrine applies “in

very narrow and limited circumstances and relates only to incidental information and not to

essential content.”  *Ky. Kingdom Amusement Co. v. Belo Ky., Inc.*, 179 S.W.3d 785, 791 (Ky.

2005).  The defamatory content of the sentence is the assertion that Scheel was a CSR.  Because

she was vice president of the company, the statement is “fundamentally inaccurate” and cannot

be cured through the use of the substantial truth doctrine.  *Id.* at 792.

Finally, Harris argues that his third statement — “in my opinion you are sick and in need

of help” [Record No. 107-8, p. 16] — is, “[o]n its face . . . merely opinion and thus, not

actionable.”  [Record No. 130, p. 12]  The Court agrees.[9]  Therefore, this statement is absolutely

privileged as pure opinion.  With regard to the remaining comments about Scheel, however,

Harris has failed to establish the absolute privilege afforded to statements of opinion because

they were factual in nature.

Harris also asserts that his first statement about MRW — that “this demonstrates how far

MRW will go to extort additional monies from WBS” [Record No. 108-5, p. 13] — was “merely

an opinion.”  [Record No. 130, p. 12]  Harris maintains that it is “clear from the surrounding

circumstances that Harris did not use the word ‘extort’ in its literal definition or to impute a

crime to MRW.  Rather, Harris intended to convey the word’s common usage meaning,

interchangeable with terms such as ‘force,’ ‘extract,’ or ‘squeeze.’”  [*Id.*, p. 14]  Yet the

---

9       Scheel does not make any specific argument as to why this statement should not be considered one
of pure opinion.  [*See* Record No. 139, p. 7.]

"surrounding circumstances" are not relevant to this inquiry, because the Court is required to analyze the statement in the context of the ethics complaint to determine the "natural and probable effect on the mind of the average lay reader." *McCall*, 623 S.W.2d at 884. Construed as a whole and in context, Harris's statement about MRW imply that Harris had "particular and articulable reasons for believing" that MRW engaged in forceful or intimidating, if not illegal, tactics to obtain money from WBS.[10] The sentence contains a factual assertion, not an opinion. Thus, it is not privileged.

### iii.    Common Interest Privilege

Harris's third affirmative defense is that the ethics complaint is entitled to the qualified privilege that applies to communications conveying matters of common interest. Kentucky law recognizes certain qualified privileges for defamatory statements. "When a qualified privilege is established, the presumption of malice disappears, and thus 'false and defamatory statements will not give rise to a cause of action unless maliciously uttered.'" *Stringer*, 151 S.W.3d at 797 (quoting *Stewart v. Williams*, 218 S.W.2d 948, 950 (1949)). In other words, once the defendant establishes the existence of a qualified privilege, the burden of proving actual malice falls on the plaintiff.

The "common interest" privilege applies "where 'the communication is one in which the party has an interest and it is made to another having a corresponding interest.'" *Stringer*, 151 S.W.3d at 796 (quoting *Baker v. Clark*, 218 S.W. 280, 285 (1920)). The "'existence of privilege is a matter of law.'" *Id.* (quoting *Columbia Sussex Corp.*, 627 S.W.2d at 276). To raise the issue

---

10    Webster's Ninth New Collegiate Dictionary (1983) defines "extort" as "to obtain from a person by force, intimidation, or undue or illegal power." *Id.*

of the common interest privilege — and thereby shift the burden to the plaintiff — a defendant must show a common interest with the third party to which he published the defamatory statements.  *Calor*, 2011 WL 4431143, at *7.  A common interest exists between two parties where the subject matter is one "in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty." *Wolff v. Benovitz*, 192 S.W.2d 730, 733 (Ky. 1946) (noting that it is "generally recognized that a qualified privilege attaches to statements and communications made in connection with the various activities of such organizations as lodges, societies, labor unions, etc.").  For example, "discussions and communications within a company which are necessary to its proper function,' give rise to a qualified privilege." *Sams v. Wal-Mart Stores East, LP*, No. 2010-CA-000007-MR, 2010 WL 4740330, at *4 (Ky. Ct. App. Nov. 24, 2010) (quoting *Dossett v. N.Y. Mining & Mfg. Co.*, 451 S.W.2d 843, 846 (Ky. 1970)).

Harris argues that, as a member of the organization, he "had an ethical duty and a common interest in maintaining the reputation of AIPAGIA as an industry leader in ethical standards."  [Record No. 130, p. 16; Record No. 114-1, p. 7]  Because the common interest privilege "has been placed in issue," the plaintiffs must "rebut the claim 'by a showing that either there was no privilege under the circumstances or that it had been abused.'" *Calor*, 2011 WL 4431143, at *16.  Scheel seeks to establish that the privilege does not apply by asserting that "AIPAGIA had no interest in the subject matter of Harris's ethics complaint," which is underscored by the "fact that Harris waited ten months to bring the WBS issue to AIP[A]GIA's attention, and Harris ceased having any interest in the DNC account over two months before he

-18-

complained of actions related to the account." [Record No. 107-1, p. 21] Similarly, MRW argues that the privilege did not exist because AIPAGIA had no "interest in the settlement negotiations that were transpiring . . . over the private dispute related to MRW's ownership interest in WBS." [Record No. 108-1, p. 20]

However, Harris's assertion is not that the underlying dispute between MRW and the defendants was an issue of interest to AIPAGIA. Instead, he contends that "Scheel and MRW had conducted themselves in a manner that jeopardized" the reputation of their profession and, therefore, he felt it was his duty to file the ethics complaint. [Record No. 130, p. 16] In her reply, Scheel argues that "Harris's loyalty [to AIPAGIA] should be viewed with suspicion, as he had not attended an AIPAGIA meeting in over two years at the time" he filed the ethics complaint.[11] [Record No. 139, p. 8] This argument is insufficient to rebut Harris's claim of qualified privilege.

The plaintiffs also argue that, based on the testimony of AIPAGIA president Angela Walton, Harris is not entitled to invoke the common interest privilege. They assert that the executive council of AIPAGIA, which initially reviewed the ethics complaint, "wanted Harris

---

11      Scheel also asserts that any contention that Harris acted from ethical concerns is ridiculous because he "admitted during his deposition that he did not consider the Code of Ethics before filing his [ethics] complaint." [Record No. 139, p. 8] Yet this argument misstates Harris's deposition testimony. Although he did admit that he did not "review the code of ethics of AIPAGIA" before filing the ethics complaint, he also testified that he was "aware . . . that a code of ethics existed." [Record No. 107-7, p. 2] Harris's actions in filing an ethics complaint before consulting the actual ethics rules of the organization — while perhaps evidencing a lack of thorough preparation — do not necessarily undermine the conclusion that Harris was motivated by concerns about "maintaining the reputation of AIPAGIA as an industry leader in ethical standards." [Record No. 130, p. 16]

to withdraw his ethics complaint because '[it] didn't really belong in AIPAGIA.'"[12] [Record No. 123, p. 15 (quoting Record No. 123-13, p. 7)]  However, it is not dispositive to the Court's analysis that neither Walton nor the executive council believed the ethics complaint to be an appropriate matter for their consideration.  A defamatory statement is "qualifiedly privileged where circumstances exists, *or are reasonably believed by the defendant to exist*, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty." *Tucker v. Kilgore*, 388 S.W.2d 112, 114 (Ky. Ct. App. 1964) (emphasis added) (internal quotation marks omitted).  AIPAGIA's bylaws set out a procedure for addressing "conflict[s] . . . between members." [Record No. 123-13, p. 4] There is a procedure for the filing, processing, and consideration of ethics complaints.  [*Id.*, pp. 5-7] And Harris has testified that he believed that Scheel and MRW "acted unprofessionally and dishonestly." [Record No. 139-1, p. 3] In light of this evidence, Harris's asserted belief that the ethics complaint was a matter of common interest to AIPAGIA is not unreasonable.  And the plaintiffs have failed to prove otherwise. Therefore, the common interest privilege applies to the ethics complaint as a matter of law.

Because Harris has successfully invoked the common interest privilege, it falls to the plaintiffs to prove that he exceeded the scope of the privilege. *Calor*, 2011 WL 4431143, at *16.

---

12      Additionally, MRW points out that "AIPAGIA's President, Angela Walton, was left wondering 'why in the world would Steve Harris submit this to – us to review.'"  [Record No. 108-1, p. 20 (quoting Record No. 107-12, p. 20)]  Walton's statement, when read in context, does not support MRW's assertion that AIPAGIA had no interest in the matter of the ethics complaint.  Rather, this part of her deposition testimony makes it clear that she found it against Harris's own best interest to bring the events that were the subject of the ethics complaint to light.  She testified that she "felt that there [were] some possible bad decisions even on his part and thought that this is a lot of mud being presented to a lot of people at AIPAGIA." [Record No 107-12, p. 20]

The common interest privilege "may be abused and its protection lost by the publisher's knowledge or reckless disregard as to the falsity of the defamatory matter; [or] by the publication of the defamatory matter for some improper purpose." *Id.* at *8 (quoting Restatement (Second) of Torts § 596 cmt. a (1977)). Additionally, the privilege may be waived if it is found that the defamatory matter is not communicated in a "'reasonable manner.'" *Id.* (quoting *Kilgore*, 388 S.W.2d at 115). The question of whether a qualified interest has been waived is factual. *Columbia Sussex Corp.*, 627 S.W.2d at 276. Therefore, unless the plaintiffs have carried their burden of proving that there is no genuine issue of material fact as to this issue, summary judgment must be denied.

Here, the plaintiffs argue that Harris had an improper purpose for filing the ethics complaint because he "testified that he 'wanted [Ms. Scheel] out of AIPAGIA based on things she'd done. But more importantly, [he] wanted her out of [his] life.'"[13] [Record No. 139, p. 9 (quoting Record no. 139-1, p. 9)] In context, however, Harris's testimony that he "wanted [Scheel] out of [his] life" was part of a discussion about an e-mail that Harris sent to Scheel's brother, Chris.[14] [Record No. 123-4, p. 4] Harris did not testify that he filed the ethics complaint to get Scheel out of his life. Therefore, this excerpt is not sufficient evidence to prove that Harris

---

[13] The exhibit cited by the plaintiffs is edited in such a way that the Court cannot ascertain the question Harris was answering without referring to a different exhibit, attached to another document. [Record No. 139-1, pp. 8-9 (skipping from page 151 of the deposition testimony to page 220); *see* Record No. 123-4, p. 4]

[14] This conclusion is further supported by the discussion that follows the mischaracterized quotation. [Record no. 139-1, p. 9 ("Q. Well, how was Chris going to get Stephanie out of your life? A. Well, I don't know. I just thought he's – I think he's her older brother . . . . If they could sit down and talk as brother and sister and he could . . . tell her to stop it.")]

had an improper purpose behind the publication of the ethics complaint to AIPAGIA, and the Court holds that a genuine issue of fact remains regarding this issue.

MRW and Scheel also contend that Harris exceeded the scope of the common interest privilege through the inclusion of the statement "you are sick and need help." [Record No. 107-8, p. 16] "The 'reasonable manner' at issue in a defamation case is how the statement was communicated — i.e., only to those who share the common interest, not to the public at large — and whether it contained additional defamatory matter that was unnecessary to accomplish the purpose of the privilege." *Calor*, 2011 WL 4431143, at *17. A qualified interest may be waived "by the publication of defamatory matter *not reasonably believed to be necessary* to accomplish the purpose for which the occasion is privileged." *Id.* at *8 (quoting Restatement (Second) of Torts § 596 cmt. a. (1977) (emphasis added)).

The Court has previously found the "sick and need help" comment to be absolutely privileged as a statement of pure opinion. However, even if it were not, the statement was not included in the body of the ethics complaint, but communicated in an e-mail to Scheel that was subsequently attached to the complaint. Scheel and MRW contend that "Harris's statement . . ., even if an opinion, goes well beyond what would have been necessary to bring Ms. Scheel's actions to AIPAGIA's attention, and even Harris admitted it was not necessary." [Record No. 139, p. 9 (citing Record No. 139-1, p. 8)] However, Harris's testimony is once again taken out of context. Harris actually admitted only that the sentence was not necessary to "get across [his] point that [Scheel] had made the statement about MRW acting illegally and that she had forgot[ten] about it." [Record No. 139-1, p. 8] He did not concede that the sentence was

-22-

completely unnecessary to the ethics complaint as a whole.  Nor did his testimony address the perceived necessity of attaching the e-mail in which he made the statement to the ethics complaint.  The plaintiffs have not met their burden of proving that Harris waived the qualified privilege by including "irrelevant defamatory matter with no bearing upon" the common interest. *Kilgore*, 388 S.W.2d at 115.  There remains a genuine question of material fact regarding Harris's reasonable belief that publishing the e-mail with his ethics complaint was necessary to accomplish his stated purpose.

Finally, the plaintiffs argue that Harris "deserves to lose any claimed privilege based on the reckless disregard as to the falsity of his defamatory statements."  [Record No. 139, p. 9] The "existence of the [qualified] privilege implicitly raises the bar on the 'knowledge of falsity' level to that recognized under other circumstances by" the Supreme Court's opinion in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), "albeit for other reasons and in other ways."  *Calor*, 2011 WL 4431143, at *11 ("This is because the privilege, if applicable, protects one's erroneous belief.").  In other words, the plaintiffs must prove that Harris made his statements with "actual malice."  *New York Times Co.*, 376 U.S. at 280.

MRW contends that "[b]efore accusing MRW and Mr. Ward of theft, Harris did not check with WBS's accountant . . . about the circumstances surrounding Chris becoming a member, even though Harris had access to that information."[15]  [Record No. 108-1, p. 11 (citing Record No. 108-4, p. 13)]  Scheel argues that "[a]s for Harris's allegation of blackmail, which

---

15      MRW also asserts that "Harris did not check with Chris himself."  [Record No. 108-1, p. 11 (citing 108-9, p. 11)]  However, the deposition testimony cited does not establish that Harris did not check his facts with Chris, merely that he did not tell Chris "he was going to file an ethics complaint against MRW . . . before he did it."  [Record No. 108-9, p. 11]

has been demonstrated not to be true, Harris did not even check with Mr. Marshall to see if there was any truth to the matter before sharing the allegation with Ms. Scheel's peers." [Record No. 107-1, p. 22] Thus, they maintain, the ethics complaint was filed with reckless indifference as to the truth of the matters asserted therein. While these arguments may ultimately persuade the jury, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In the context of defamation actions, the "jury normally determines whether a privilege was abused." *Cargill v. Greater Salem Baptist Church*, 215 S.W.3d 63, 68 (Ky. Ct. App. 2006). The plaintiffs' evidence is not sufficient to affirmatively prove that no issue of fact remains with regard to whether Harris's behavior in filing the ethics complaint rose to the level of recklessness.[16] Thus, the evidence creates a factual question regarding whether Harris exceeded the scope of the common interest privilege. Scheel's and MRW's motions for partial summary judgment will be denied concerning Harris's liability. Moreover, because the issue of liability has not been resolved in their favor, the plaintiffs' request for a jury instruction on punitive damages will be denied at this time.

---

16      Several cases suggest that a motion for summary judgment that is brought by the defendant in a defamation case may be granted "when the record shows no facts which would lead to the conclusion that the [defendant] acted with malice," *Cargill*, 215 S.W.3d at 68; *see Harstad v. Whiteman*, 338 S.W.3d 804, 811 (Ky. Ct. App. 2011). However, the plaintiffs have failed to identify a case in which the party with the burden at trial was able to establish actual malice at the summary judgment phase. Indeed, they concede in their response to Brooks's motion that "summary judgment is infrequently appropriate for resolving whether 'actual malice' exists." [Record No. 125, p. 35]

## B.        Brooks's Motion for Summary Judgment

Brooks also seeks summary judgment on the claims asserted against him in this action.[17] He contends that Scheel's defamation claim fails as a matter of law and that no affirmative facts support her conspiracy claim.  For the reasons explained below, the Court will grant Brooks' motion.

### 1.        Defamation

Brooks argues that Scheel has failed to establish all of the elements of her defamation claim.  He contends that his statements were not defamatory because they did not "rise to the level of defamation per se." [Record No. 111-1, p. 8]  Additionally, he asserts that Scheel has not proved the element of publication because "it was Harris that published the Ethics Complaint."  [Record No. 111-1, p. 16]  Finally, Brooks raises the affirmative defenses of opinion, truth, and common interest privilege.

As an initial matter, the Court concludes that Brooks's e-mail contained defamatory language.  "The objectionable words must be construed in their most natural meaning and in the sense in which they would be understood by those to whom they were addressed."  *Digest Publ'g Co. v. Perry Publ'g Co.*, 284 S.W.2d 832, 834 (Ky. 1955).  The e-mail accuses Scheel of "bullying [him] with inappropriate communication," "lying about the deal," and being "impossible to work with."  [Record No. 108-5, p. 12]  These comments would certainly tend to "lower [her] in the estimation of the community or to deter third persons from associating or dealing with [her]."  *Stringer*, 151 S.W.3d at 793.  Furthermore, these statements are defamatory

---

17        MRW dismissed its claims against Brooks on May 11, 2012.  [Record No. 117]  As a result, only Scheel's claims remain pending against him at this time.

per se because they are "incompatible with [her] business, trade, profession or office." *Gilliam*, 215 S.W.3d at 61.

Moreover, the Court concludes that the e-mail was defamatory when sent to Harris, not just once it was attached to the ethics complaint. Brooks asserts that the language used in the e-mail would not harm Scheel's reputation with Harris because he "already had a negative opinion of her." [Record No. 137, p. 3] However, for a communication to be defamatory, "it is not necessary that the communication *actually* cause harm to another's reputation or deter third persons from associating or dealing with [her]." Restatement (Second) of Torts § 559 cmt. d (1977) (emphasis added). Rather, it must only be capable of having such an effect.

However, the communication between Brooks and Harris was privileged because the two defendants had a common interest in the dispute with MRW. *See Stringer*, 151 S.W.3d at 796. Even without evidence that there was an underlying dispute, the communication would be conditionally privileged because business partners and "[p]ersons associated together in professional activities" are entitled to "communicate among themselves matter defamatory of others which concerns their common interests." Restatement (Second) of Torts § 596 cmt. d (1977); *see Calor*, 2011 WL 4431143, at *7 (finding that parties had a "common business interest in the accurate reporting of [the plaintiff's] work hours" because neither defendant "wanted to pay for hours she didn't work"). Because Brooks has raised the issue of privilege, the burden is on Scheel to prove actual malice with regard to the e-mail between Brooks and Harris. *Stringer*, 151 S.W.3d at 797. And she has failed to meet this burden. *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002) (the nonmoving party must present "significant

probative evidence" of a genuine dispute in order to defeat the motion for summary judgment). Therefore, Brooks is entitled to summary judgment with respect to the e-mail as it was originally published to Harris.

Regarding the e-mail reproduced in the ethics complaint, Brooks disputes the third element of Scheel's defamation claim: publication.  As an initial matter, the Restatement provides that, "so long as the initial publication was privileged, the publisher is not liable for repetition by the recipient unless the privilege was exceeded or abused in some fashion." Restatement (Second) of Torts § 577 cmt. n (1977).  Because the initial communication between Brooks and Harris was privileged, the burden is on Scheel to present evidence that Brooks waived the privilege in order to satisfy the element of publication.  Although she argues that Harris exceeded the scope of the common interest privilege, Scheel does not assert that Brooks has done so.  [*See* Record No. 125, pp. 26-29] In short, Scheel has not proved the element of publication, and her defamation claim against Brooks must fail.

However, even if the communication between Brooks and Harris was not privileged, Brooks would be entitled to summary judgment on the defamation claim.  Brooks contends that Scheel "has not and cannot produce any evidence that [he] knew that the e[-]mail would be used when Harris filed the Ethics Complaint."  [Record No. 137, p. 5]  In Kentucky,

> Defamation is a quasi-intentional tort, i.e., with the exception of the element of publication, its basis is in strict liability.  Publication, however, must be shown to have been done either negligently or intentionally.  The emphasis is not upon the meaning of the remarks as being negligently or intentionally defamatory but rather upon the manner in which such remarks were conveyed.  The element of publication takes an adverbial stance: Were the words either negligently or intentionally communicated as to be heard by an understanding third party?

*Columbia Sussex Corp.*, 627 S.W.2d at 273-74.  Scheel has not produced evidence that would support a finding of intentional publication.  [*See* Record No. 125, pp. 29-31]  Therefore, summary judgment is appropriate unless Scheel can prove that Brooks negligently communicated his statements to AIPAGIA.

Kentucky courts refer to the Restatement (Second) of Torts to define negligent publication.  *Cvitkovic v. Freeman*, No. 2008–CA–001647–MR, 2010 WL 3292906, at *3 (Ky. Ct. App. Aug.6, 2010).  Section 577 of the Restatement provides that "[i]f a reasonable person would recognize that an act creates an unreasonable risk that the defamatory matter will be communicated to a third person, the conduct becomes a negligent communication."  Restatement (Second) of Torts § 577 cmt. k (1977).  Therefore, Brooks's e-mail may be considered to be negligently published if there was an "unreasonable risk" that it would be seen by a third party. Brooks has presented affirmative evidence that he had no knowledge of Harris's intention to file an ethics complaint against Scheel.  [Record No. 111-1, pp. 17-19]  Scheel argues only that "there are genuine issues of material fact regarding whether Brooks negligently communicated his statements to Harris."  [Record No. 125, p. 30]  Because Scheel has not produced evidence that would support the reasonable conclusion that Brooks should have known that there was a risk Harris would publish his e-mail to a third person, summary judgment is appropriate with respect to the defamation claim against Brooks.[18]

---

18    Because Brooks is entitled to summary judgment on the grounds that Scheel failed to prove publication, it is not necessary to address his affirmative defenses.

-28-

## 2.      Conspiracy

Scheel has also asserted a claim for common law conspiracy against Brooks.[19]  Her claim is "based on a single one-page e-mail Brooks drafted to Harris on March 22, 2010, which was subsequently incorporated into Harris's ethics complaint and republished to AIPAGIA on March 29, 2010."  [Record No. 125, p. 37]  Brooks asserts that there is "no evidence that Harris and Brooks acted in concert when filing the Ethics Complaint."  [Record No. 111-1, p. 25]  Scheel maintains that a genuine issue of material fact exists as to the circumstances surrounding Brooks's submission of the e-mail to Harris.  Thus, she asserts, summary judgment is not appropriate regarding this claim.

Kentucky law defines the term "conspiracy" as a "corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful means."  *Smith v. Bd. of Educ. of Ludlow*, 94 S.W.2d 321, 325 (Ky. Ct. App. 1936).  To prevail on her claim of civil conspiracy, Scheel "must show an unlawful/corrupt combination or agreement between [Harris] and [Brooks] . . . to do by some concerted action an unlawful act."  *Montgomery v. Milam*, 910 S.W.2d 237, 239 (Ky. 1995).  In support of his motion for summary judgment, Harris argues that his deposition testimony, and that of Brooks, establish that there was no agreement to defame Scheel because "Harris simply asked Brooks for an e-mail setting forth his dealings with Stephanie and the DNC over the last several years

---

19      Although the plaintiffs' Complaint includes a civil conspiracy claim brought by both plaintiffs [Record No. 1 ¶ 63], the plaintiffs concede that "only Ms. Scheel has a civil conspiracy claim" because MRW does not have a defamation claim against Brooks.  [Record No. 123, p. 31 n.125]  The Complaint also includes a claim for statutory conspiracy under the Virginia Civil Conspiracy Act, Va. Code Ann. § 18.2-499, et seq.  [Record No. 1 ¶ 60]  However, because the Court must apply Kentucky law, the only claim available to Scheel arises under Kentucky common law.

and Brooks gave him just that." [Record No. 142, p. 14] Scheel counters that there are inconsistencies between the testimonies of the two defendants.[20] She asserts that the issue should be submitted to the jury, which "is not obligated to accept as true the testimony of Harris and Brooks on this subject, particularly considering the implausibility of their testimony." [Record No. 125, p. 38] However, the assertion that a jury might disbelieve the defendant or his witnesses is not sufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 256. Scheel "must present affirmative evidence in order to defeat a properly supported motion for summary judgment . . . even where the evidence is likely to be within the possession of the defendant." *Id.* at 257.

Harris has testified that he "didn't give [Brooks] a reason" why he needed the e-mail. [Record No. 123-3, p. 6] Similarly, Brooks testified that he had no "idea that [the e-mail] was going to be incorporated into any other document." [Record No. 123-18, p. 4] Scheel asserts that it makes no sense why "Brooks [would] update Harris on an account that neither of them had held an interest in for over two months." [Record No. 125, p. 38] This argument is unavailing because — as Scheel herself concedes — even though their relationship with the DNC account had ended, litigation was ongoing regarding the WBS succession issue. [*Id.* ("Harris and Brooks . . . were in the middle of negotiating against MRW (the company for which Ms. Scheel was Vice President) over WBS. . .")]

---

20      The inconsistencies that she points out are the differences between Harris's testimony that he asked Brooks to "put together a draft or letter or an e-mail that would explain [his] working relationship with and business practices dealing with [Scheel]" [Record No. 123-3, p. 6], and Brooks's statement that Harris asked him for an "update . . . on his dealings with [Scheel] on the DNC account, not his general business dealings with [her]." [Record No. 125, pp. 37-38; Record No. 123-18, p. 3] These inconsistencies are minor and do not create a material question of fact regarding whether the two defendants conspired to defame Scheel.

-30-

Civil conspiracy is "inherently difficult to prove, and notwithstanding that difficulty, the burden is on the party alleging that a conspiracy exists to establish each and every element of the claim in order to prevail. *Shure v. Ford*, No. 2011-CA-000144-MR, 2012 WL 1657133, at *11 (Ky. Ct. App. May 11, 2012). There "must be proof that the defendants acted tortiously pursuant to a common design, or that they rendered substantial assistance to others to accomplish the tortious act." *Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co.*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008); *cf. Montgomery*, 910 S.W.2d at 239 ("Ordinarily, the mere preparation of a document upon the request of a client furnishes no basis for a conspiracy issue."). Scheel has presented no proof that Brooks was an "active, knowing participant[] in [Harris's] misconduct." *Peoples Bank*, 277 S.W.3d at 261; *see* Fed. R. Civ. p. 56(e).

Scheel has failed to "present evidence from which a jury might return a verdict in [her] favor." *Anderson*, 477 U.S. at 257. The claim is based on pure speculation. The only support Scheel offers for the alleged agreement between Harris and Brooks is the "suspicious date of one of the e[-]mails" attached to the Ethics Complaint.[21]   [Record No. 111-1, p. 25]   This is insufficient to create a genuine issue of fact requiring a trial. Therefore, Brooks's motion for summary judgment will be granted regarding Scheel's civil conspiracy claim.[22]

---

21     Indeed, Scheel has admitted that she has no "other evidence that would support" her conspiracy claim.  [Record No. 111-7, p. 5]

22     Brooks's motion for summary judgment includes several requests to exclude evidence of damages. [Record No. 111-1, pp. 19-23]  Because the Court has determined that he is entitled to summary judgment regarding the issue of his liability, it will not address these requests.

-31-

## C.       Harris's Motion for Summary Judgment

Harris asserts that he is entitled to summary judgment on the claims asserted against him because Scheel and MRW have "failed to prove the essential elements of defamation and conspiracy." [Record No. 114-1, p. 3] The plaintiffs request that the Court deny Harris's motion for summary judgment "on its face" due to his "failure to comply with Rule 56 of the Federal Rules of Civil Procedure." [Record No. 123, p. 1]  It is true that Harris has not cited to any specific "parts of materials in the record" in his motion for summary judgment.  Fed. R. Civ. P. 56(c)(1)(A). Rule 56 provides that when deciding a motion for summary judgment, the Court "need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  Accordingly, the Court will consider the voluminous filings submitted with the other three motions, and rule on the merits of Harris's motion.

Harris's motion for summary judgment will be denied concerning the plaintiffs' defamation claims.  The Court has previously determined that the plaintiffs established the elements of defamation against Harris.[23]  Further, although the qualified common interest privilege applies to the ethics complaint, the plaintiffs have presented evidence that could "lead to the conclusion" that he abused the privilege, thereby waiving its protection.  *Cargill*, 215 S.W.3d at 68.  Because the plaintiffs have "adduce[d] such evidence sufficient to create a genuine issue of fact," the Court will deny Harris's motion with respect to the plaintiffs' defamation claim.  *Harstad*, 338 S.W.3d at 811.  However, for the reasons explained in granting

---

[23]       Harris did not raise the affirmative defenses of truth or opinion in his motion for summary judgment.

Brooks's motion for summary judgment, the Court will grant Harris's motion for summary judgment on the conspiracy claim.

Finally, Harris asserts that the plaintiffs' "claim for punitive damages must fail" because there is "clear evidence of a lack of malice or gross negligence." [Record No. 114-1, p. 12] The plaintiffs, however, maintain that Harris's defamatory per se statements create a "conclusive presumption of both malice and damage." [Record No. 123, p. 35] They cite *Ray v. Shemwell*, 217 S.W. 351 (Ky. 1919), for the proposition that "[i]f the word or words charged are actionable per se, the law presumes malice, and punitive damages may be recovered, and it is error for the instruction to require a showing of malice in order to recover punitive damages or any damages." *Id.* at 353. As explained above, the Court has determined that several of Harris's statements are defamatory per se. If the plaintiffs can prove at trial that Harris acted with actual malice, they would be entitled to seek punitive damages on their defamation claims. Therefore, summary judgment is not proper, and the Court will deny Harris's motion regarding the issue of punitive damages.

## IV.    Conclusion

Defendant Brooks is entitled to summary judgment concerning all claims. Likewise, Defendant Harris is entitled to summary judgment regarding the plaintiffs' conspiracy claim. However, neither the plaintiffs nor Defendant Harris is entitled to summary judgment with respect to the remaining claim for defamation. The Court also concludes that summary judgment is not appropriate regarding: (i) the dismissal of the plaintiffs' punitive damage claim or (ii) the appropriateness of a jury instruction regarding this issue. Accordingly, it is hereby

-33-

**ORDERED** as follows:

1.     Plaintiff Stephanie Scheel's Motion for Partial Summary Judgment [Record No. 107] is **DENIED**.

2.     Plaintiff MRW Holdings, Inc.'s Motion for Partial Summary Judgment [Record No. 108] is **DENIED**.

3.     Defendant Gregg Brooks's Motion for Summary Judgment [Record No. 111] is **GRANTED**.  The claims against Brooks are **DISMISSED**, with prejudice.  To the extent that Brooks's motion is construed as a motion to exclude evidence of damages, the motion is **DENIED**, without prejudice.

4.     Defendant Gregg Brooks's Motion in Limine and Daubert Motions [Record No. 112] are **DENIED** as moot.

5.     Defendant Steve Harris's Motion for Summary Judgment [Record No. 114] is **GRANTED** with respect to the conspiracy claim (Count III).  The plaintiffs' common law conspiracy claim against Harris is **DISMISSED**, with prejudice.  The motion is **DENIED** with respect to Scheel's and MRW's defamation claim (Count I).

6.     Defendant Steve Harris's Motion to Continue [Record No. 145] is **DENIED**.

This 28th day of August, 2012.



Signed By:

*Danny C. Reeves*  DCR

United States District Judge

-34-