UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| STEPHANIE SCHEEL and MRW HOLDINGS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 3: 11-17-DCR |
| V. | ) ) | |
| STEVE HARRIS, et al., | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of various pretrial motions. Defendant Steve Harris has filed a motion *in limine* and motion to exclude. [Record Nos. 113, 121] He seeks to prohibit Plaintiffs Stephanie Scheel ("Scheel") and MRW Holdings, Inc. ("MRW") from presenting evidence at trial related to certain items of damage and he requests that the Court exclude certain testimony. The plaintiffs, meanwhile, have moved to exclude the testimony of Harris's expert, Dr. Melissa Baucus. [Record No. 109] Scheel further requests that she be granted leave to supplement her disclosures to identify a new testifying expert. [Record No. 100]

For the reasons explained below, the Court will grant Harris's motions, in part. The plaintiffs' motion to exclude will also be granted, in part. However, Scheel's motion to supplement will be denied.

## I.

This action arises from an ethics complaint that Harris filed against Scheel and MRW with the American Institute of Professional Association Group Insurance Administrators ("AIPAGIA").[1]  The plaintiffs assert claims of defamation and civil conspiracy against Harris and his co-defendant Gregg Brooks.  Scheel filed her motion to supplement on April 23, 2012. [Record No. 100]  The Court held a scheduling conference on May 1, 2012, during which the defendants indicated that they opposed the motion to supplement.  The parties then filed various pretrial motions on May 7, 2012. [Record Nos. 109, 113]  On May 23, 2012, after the plaintiffs supplemented their responses to Harris's interrogatories regarding damages, Harris filed a motion to exclude those documents. [Record No. 121]  On August 28, 2012, the Court addressed the parties' motions for summary judgment.  It granted Brooks's motion and dismissed the claims against him.  However, Harris's motion was granted only with regard to Scheel's conspiracy claim.  The plaintiffs' motions for partial summary judgment were denied. [Record No. 146]

## II.

In his motion *in limine*, Harris asks the Court to prohibit the plaintiffs from introducing: (1) evidence of damages; (2) testimony that certain individuals have knowledge of the ethics complaint; and (3) testimony about Harris's arrest for a traffic violation. [Record No. 113]  In his motion to exclude, Harris seeks to prevent the plaintiffs from presenting evidence concerning

---

1       A complete discussion of the facts relevant to this action is contained in the Court's Memorandum Opinion and Order entered August 28, 2012. [*See* Record No. 146, pp. 2-5]

the damages claimed in the plaintiffs' supplemental responses to his interrogatories.  [Record No. 121]

While the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to a district court's inherent authority to manage the course of trials.  *Luce v. United States*, 469 U.S. 38, 41 (1984).  While a party can ask the Court to make an *in limine* ruling on evidentiary matters, it is within the Court's discretion to do so.  In short, there is no right to an *in limine* ruling.  *Huddleston v. United States*, 485 U.S. 681, 688–89 (1988).  In fact, a ruling on a motion *in limine* is nothing more than a preliminary opinion which allows the parties to better formulate their trial strategy.  *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994).  The Court is not bound by an *in limine* ruling and can change its determination during trial where sufficient facts are offered developed to warrant the change.  *Id.*; *see also Luce*, 469 U.S. at 41–42 (noting that "*even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling*" (emphasis added)).

## A.    Damages

Harris seeks exclusion of all "[t]estimony and proof of damages allegedly incurred by Plaintiffs Scheel and MRW."  [Record No. 113, p. 1]  As grounds for this request, Harris contends that the plaintiffs failed to comply with the requirements for initial disclosures concerning damages.  He asserts that "all of Plaintiffs['] disclosures and responses to requested discovery have been dismissive of their obligation to provide any detail of their claimed damages."  [Record No. 143, p. 2]  As a result, Harris contends that he will be prejudiced at trial

-3-

by the plaintiffs' failure "to produce any real evidence (aside from their own testimony) of compensatory damages caused by the Ethics Complaint[,] . . . to disclose any value or computation for their claimed damages as required by the Rules, and . . . to properly and timely supplement discovery as required by the Rules and Order of this Court."  [*Id.*]

Rule 26(a) of the Federal Rules of Civil Procedure sets out the initial disclosure requirements for civil actions.  Under this Rule, a plaintiff must provide

> a computation of each category of damages claimed by the disclosing party — who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.

Fed. R. Civ. P. 26(a)(1)(A)(iii).

A plaintiff is also required to supplement or correct his or her Rule 26(a) disclosure statement "in a timely manner if [he or she] learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process." Fed. R. Civ. P. 26(e)(1)(A). The Scheduling Order entered in this matter on June 7, 2011, provided that "[s]upplementation under Rule 26(e) shall be due within thirty (30) days of the discovery of new information, but by no later than thirty (30) days prior to the close of discovery."  [Record No. 25, p. 3]  The deadline for completing all discovery was March 5, 2012.[2]  [*Id.*; Record No. 86]

---

2       The parties only moved for an extension of this deadline with regard to the deposition of one lay witness.  [Record No. 85]  The Court gave the parties until April 5, 2012, to complete this deposition, and extended the deadline for dispositive motions, motions *in limine*, and *Daubert* motions to May 7, 2012. [Record No. 86]

A plaintiff who fails to provide the information required by Rule 26(a), "is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  The test for exclusion under Rule 37(c) is "very simple: the sanction is mandatory unless there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless." *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 370 (6th Cir. 2010) (internal quotation marks omitted).

### 1.    Plaintiffs' Disclosure of Damages

In their initial disclosure statement filed on September 5, 2011, the plaintiffs declared the following regarding the damages claimed in this matter:

> Plaintiffs have not yet computed each category of damages suffered as a result of Defendants' actions.  Plaintiffs will provide Defendants with such computations once they are performed for the following categories of damages: lost profits (including future profits); injury to reputation (generally, and in trade or business); pain and suffering; and[] damages stemming from expenses incurred in preserving and restoring Plaintiffs' reputations.

[Record No. 20, p. 3]  They reserved the right to supplement the initial disclosure statement "in the event they identify additional individuals, documents, computations, tangible things or categories of damages that should be disclosed."  [*Id.*, p. 4]

The plaintiffs responded to each of Harris's interrogatories requesting specific monetary amounts and calculations with an assertion that discovery regarding damages was ongoing and a reservation of the right to supplement the answer "as discovery progresses."[3]  [Record No. 113,

---

3    For instance, they assert that "plaintiff is attempting to ascertain the scope and harm of defendant Harris's defamatory statements."  [Record No. 113, p. 3 (quoting Scheel's answer to Interrogatory No. 15); *see also id.*, pp. 4-5]  The plaintiffs gave similar responses to the interrogatories propounded by Harris's co-

p. 3]  Prior to the date on which Harris filed his motion *in limine*, there was "absolutely no supplementation of damages to be found anywhere in this Court's record."  [*Id.*, p. 7]

On May 18, 2012, Scheel submitted a supplemental response to Interrogatory No. 15 propounded by Harris.  The interrogatory requested a statement regarding monetary amount of damages claimed for each defamatory statement.  Harris also requested that Scheel "provide the manner in which that monetary amount was reached."  [Record No. 121-7, p. 1]  Scheel objected to the interrogatory on the ground that Harris's statements were defamatory per se, and thus "damages are presumed and [Scheel] may recover against . . . Harris without alleging or proving damages."  [*Id.*]  She also indicated that she "will ask a jury to return a verdict of $750,000 against Defendant Harris for [her] compensatory damages," and that she seeks punitive damages in an unstated amount.  [*Id.*, p. 2]  Scheel maintains that the compensatory damages are based on

> damages she has incurred as a result of Defendant Harris's defamatory statements includ[ing], but . . . not necessarily limited to, depression, anxiety, fear, nervousness, mental anguish, diminished self-esteem, humiliation, loss of enjoyment of life, shame, embarrassment, sadness, sense of hopelessness, isolation, dysfunction, injury to reputation, and emotional pain and suffering.

[*Id.*]

Similarly, MRW provided its first supplemental response to three of Harris's interrogatories on May 18, 2012.  It also argued that "damages are presumed" and, therefore, it "may recover against Defendant Harris without alleging or proving damages."  [Record No. 121-3, p. 1]  MRW indicated, however, that it plans to "submit proof to the jury that Defendant

---

defendant Brooks.  [Record No. 113, pp. 5-7]

Harris's defamatory statements . . . caused MRW to lose the Democratic National Committee account which MRW had serviced for nearly ten years."  [*Id.*, p. 2]  MRW asserted that the "DNC account was generating $166,251.21 per year of net income."  [*Id.*]  Moreover, MRW stated that it intends to claim "expenses of $20,374.08 associated with attempting to restore its reputation."  [*Id.*]  As a result, it asserts that it is entitled to $519,127.71.[4]  MRW also indicates its intention to seek punitive damages.

### 2.    Analysis

The initial disclosure provided by the plaintiffs was deficient because it was completely devoid of any dollar amounts or supporting information and/or documentation.  Scheel's supplemental response is similarly lacking because it is no more informative than the initial disclosure.  The grand total of $750,000 is accompanied by no explanation of how such a figure was calculated.  Further, MRW did not disclose the dollar amount for its lost-profits claim in a timely manner, as the First Supplemental Response containing that information was submitted to the defendants more than three months after the deadline for supplementation pursuant to Rule 26(e).  Even if it had been timely, the disclosure was insufficient because it lacked supporting documentation that would allow Harris to "independently analyze" the claim.  *Bessemer*, 596 F.3d at 370.  Thus, neither the initial disclosure nor the plaintiffs' supplemental responses sufficed to fulfill the obligation imposed by Rule 26(a)(1)(A)(iii).[5]

---

4       The plaintiffs did not provide their method of computing this figure.  However, the Court can infer that the total damages include three years of alleged lost profits from the DNC account.

5       The plaintiffs repeatedly argue that they have "extensively disclosed their damages throughout this case."  [Record No. 128, p. 2]  They seem to refer to their disclosure of the types of damages sought.  [*Id.*, p. 4 (arguing that they have "ma[de] clear the *nature* of the damages" sought (emphasis added)); *see* Record No. 20, p. 3]  Yet, a "computation of each category of damages claimed" is expressly required by the Federal

Having found the plaintiffs' Rule 26 disclosures lacking with regard to the issue of damages, the Court now considers whether exclusion is warranted under Rule 37(c).  As an initial matter, the plaintiffs aver that Harris has suffered no prejudice from their failure to disclose a computation of their damages.  [*See* Record No. 128, pp. 10-11]  However, the Court need not consider the prejudice to Harris.  *Bessemer*, 596 F.3d at 370 (explaining that "prejudice to the adversary" is a factor in the "four-part test used to determine the appropriateness of dismissal as a discovery sanction under Rule 37(b)," not Rule 37(c)).  Rather, the Court must determine whether "there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless."  *Id.* (internal quotation marks omitted).  An omission is "harmless" if it involves "an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party."  *Vance ex rel. Hammons v. United States*, No. 98-5488, 1999 U.S. App. LEXIS 14943, at *17 (6th Cir. June 25, 1999) (emphasis omitted).  The Court must, therefore, consider the classes of damages claimed by the plaintiffs to determine whether the plaintiffs have provided a reasonable excuse for their failure to comply or otherwise sufficiently shown harmlessness.

The plaintiffs first argue that because Harris's "words are defamatory per se, damages are presumed and the plaintiff may recover without alleging special damages."  [Record No. 128, p. 1]  While this is true, it is not relevant to Harris's motion *in limine*.  In a defamation case,

---

Rules of Civil Procedure.  Fed. R. Civ. P. 26(a)(1)(A)(iii).  Therefore, as *Bessemer* instructs, the plaintiffs' disclosure of the various classes of damages sought is not sufficient to satisfy their initial disclosure requirement.  596 F.3d at 367; *see also Poore v. Sterling Testing Sys., Inc.*, No. 6:04-CV-194-KKC, 2006 U.S. Dist. LEXIS 4049, at *7 (E.D. Ky. Feb. 1, 2006) (excluding damages disclosed after close of discovery, "which [were] calculated in a manner that was entirely different than the calculation contained in [the plaintiff's] discovery responses").

statements that "attribute to someone a criminal offense, . . . or conduct which is incompatible with [her] business, trade, profession, or office" are considered defamatory per se.  *Gilliam v. Pikeville United Methodist Hosp. of Ky., Inc.*, 215 S.W.3d 56, 61 (Ky. Ct. App. 2007).  Thus, a plaintiff can proceed with a claim of defamation per se without having to prove "special damages, *i.e.*, actual injury to reputation."  *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 795 (Ky. 2004).  In other words, unless a defamatory statement is actionable per se, "extrinsic facts must be pleaded to explain that the statement is defamatory."  *E.W. Scripps Co. v. Cholmondelay*, 569 S.W.2d 700, 702 (Ky. Ct. App. 1978).  A finding that certain words are defamatory per se simply eases the plaintiffs' burden of establishing the elements of their defamation case.  It does not remove the burden of proving the amount of the damages caused by the defamatory statements.  Even if it did, it would not relieve the plaintiff of the need to comply with the Federal Rules of Civil Procedure.  Therefore, the plaintiffs' argument is without merit.

The plaintiffs also make several arguments to the effect that they "provided sufficient information" for Harris to have "'an early understanding of the basis and amount of [the] damages claim [he faces].'"  [Record No. 128, p. 11 (quoting *Hewlett-Packard Co. v. Factory Mut. Ins. Co.*, No. 04-2791 TPC DF, 2006 U.S. Dist. LEXIS 44365, at *40 (S.D.N.Y. June 27, 2006))]  In other words, the plaintiffs maintain that they substantially complied with the disclosure requirement — even though their disclosures were technically deficient — so that the defendants had sufficient knowledge of the amount of damages claimed.  The Court will review these arguments to determine if the plaintiffs' "non-compliance in this case was harmless."

-9-

*Santos v. Farmers Ins. Exch.*, No. 07-11229, 2008 U.S. Dist. LEXIS 56630, at *4 (E.D. Mich. July 24, 2008); *see Vance*, 1999 U.S. App. LEXIS 14943, at *17.

### i.      Lost Profits Damages

The first category of damages in contention concerns the plaintiffs' claim for lost profits. The plaintiffs contend that they "have repeatedly disclosed that the lost Democratic National Committee account is the lost profits they will look to recover at trial." [Record No. 128, p. 2] They maintain that Harris is "well aware of the value of the account" because he received commissions from it for almost ten years, until 2010. [*Id.*]

The *Bessemer* case, involving an admiralty action for damages resulting from an accident on Lake Erie, is instructive here. The district court granted summary judgment to the plaintiff and awarded "cost-of-repair damages." 596 F.3d at 360. However, the plaintiff was not permitted to recover lost profits because the court found that the plaintiff "did not adequately disclose the basis of its lost-profits claim." *Id.* The *Bessemer* plaintiff's initial disclosure referred to the "pre-suit letter demanding approximately $1.4 million" for "loss of business damages." *Id.* at 367. Additionally, the plaintiff submitted a one-page spreadsheet, which included a "Grand Total of $1,601,675." *Id.* (internal quotation marks omitted). The spreadsheet listed "dollar amounts for 'managers' time,' 'employees lay-off,' 'trains diverted,' and 'tonnage lost'" but otherwise provided "no explanation and no supporting documentation to back up the calculations." *Id.* Despite the defendant's efforts during discovery, the plaintiff still failed to convey "all of the necessary information — including costs saved — to support the 'exact' amount of lost profits." *Id.* at 368. The Sixth Circuit affirmed the district court's

decision to exclude the evidence of lost-profits damages because the plaintiff "came up short in meeting its Rule 26 obligations." *Id.* at 369.

Regarding the loss of the DNC account, the plaintiffs assert that they "disclosed to [the defendants] that the basis of their lost profits claim was the loss of the [DNC] account." [Record No. 128, p. 12]  They maintain that they conveyed this information through Scheel's response to Brooks's first set of interrogatories.[6]  [Record No. 128, p. 12 n.35]  Scheel responded to Brooks's interrogatories with the following statement: "To date, Plaintiff has identified MRW's Democratic National Committee account and MRW's Loyola High School of Los Angeles as possible accounts lost as a result of Defendant Brooks's actions."  [Record No. 128-4, p. 33] However, this statement merely alerted the defendants to the possibility of the DNC account being claimed as damages.  *See Bessemer*, 596 F.3d at 369 (concluding that plaintiff's inclusion of a letter from a customer stating that it "was considering not renewing its contract" was insufficient to "adequately inform [the defendant] about the extent of damages claimed if [the customer] *canceled* the contract").  The speculative nature of this response is even more pronounced when the Court considers the fact that the plaintiffs now seek damages for the loss of the DNC account but not the Loyola account.  [*See* Record No. 128, p. 12.] Moreover, Scheel did not adequately inform the defendants of the "extent of damages claimed" if the DNC account was indeed claimed as lost profits, because she did not indicate the value of either the DNC

---

6    This was a response to *Brooks's* interrogatory, not Harris's.  The implied argument is that Harris should have learned from Brooks that Scheel would claim lost profits from the DNC account.  Even though the discovery responses were served on Harris's attorney, this is a rather attenuated method of disclosure. However, the Court will assume for the sake of argument that Scheel's response to another defendant's interrogatory would be sufficient if the information were complete.

account or the Loyola High School account.  *Bessemer*, 596 F.3d at 369.  This is in spite of the interrogatory's request for a statement of the "[g]ross amount of [the] job" and the "[p]rojected profit" from it.  [Record No. 128-4, p. 33]  In summary, Scheel's response to Brooks's first set of interrogatories did not provide Harris with sufficient knowledge of the amount of lost-profit damages sought.

The plaintiffs also assert that Scheel's deposition testimony provided Harris with the existence or amount of damages caused by the loss of the DNC account.[7]  However, Scheel was not particularly clear about the actual value of the account.  [*See* Record No. 128-5, p. 14 (asserting that the "DNC was 90 percent of [her] income" and approximating her income from the account to be $2,000 to $2,500 per month); *see also id.*, p. 16 ("I basically went from getting $8,000 a month to 500 overnight.").]  Although Peggy Ward, the president of MRW, apparently testified that the "DNC account generated $120,000 in revenue"[8] [Record No. 128, p. 12], Scheel testified that the income changed from year to year.  [Record No. 128-5, p. 15]  This indicates that Harris needed some additional evidence of the value of the account other than his memory of "receiv[ing] commissions from the DNC account for nine years."[9]  [Record No. 128, p. 12]

---

7    The plaintiffs assert that the "circumstances here mirror" the situation in *Lucterhand v. Granite Microsystems, Inc.*, No. 05-CV-1047, 2007 U.S. Dist. LEXIS 15072 (E.D. Wisc. Mar. 2, 2007).  That case, which arose from a labor dispute, involved a claim for lost wages.  *Id.* at *51.  The court concluded that the failure to disclose a specific computation was not harmful to the defendant — the plaintiff's employer — because it already knew all of the relevant factors to a computation of his lost wages.  *Id.* at *53-54.  The case is inapposite because the plaintiffs have not shown that Harris was in possession of similar information.

8    The plaintiffs do not cite the portion of her deposition testimony in which Ms. Ward makes this assertion.

9    As Scheel herself has argued, Harris was not involved in servicing the DNC account, and simply received a commission check once a month.  [Record No. 107-1, p. 7]

-12-

Further, other deposition testimony indicates that the plaintiffs would not seek any lost income from the DNC account because, as Harris points out, "Plaintiffs both testified that they ha[d] no idea why the account was lost."  [Record No. 144, p. 2]  Indeed, Scheel testified that her contact at the DNC told her that "the powers that be decided to go elsewhere" when she asked why they were ending the professional relationship.[10]  [Record No. 144-1, p. 2]  Based on this testimony, coupled with the fact that the plaintiffs repeatedly failed to supplement their disclosure on the issue of damages, the Court concludes that Harris was not on notice that the DNC account would form the basis of any claim for damages.

Moreover, there is some confusion regarding which plaintiff actually seeks to claim the lost profits from the DNC account.  MRW asserts that it will seek three years of lost "net income for MRW."  [Record No. 121-3, p. 2]  However, the plaintiffs have characterized Scheel's response to Brooks's interrogatories as an attempt to claim the same lost profits.  [*See* Record No. 128, p. 12; Record No. 128-4, p. 33.]  To complicate matters further, Scheel testified that at some point in 2010, Scheel began receiving "100 percent of the DNC account."  [Record No. 128-5, p. 16 ("Q. So when the DNC account was lost, MRW didn't take a financial detriment but you did?  A. Yes. . . . Q. Well, yeah, because the income didn't change to MRW, it was passing through to you.  A. Yes.")]  Therefore, the discovery provided by the plaintiffs is not

---

10    Ms. Ward's deposition included the following exchange:

Q. All right.  Do you have any evidence that the DNC did not place its account with you because of this matter?
A. I don't deal with the DNC.
Q. So you don't know?
A. I don't know.

[Record No. 144-2, p. 2]

-13-

sufficient to identify which plaintiff would claim the lost profits from the DNC account, much less the numerical value of that claim.

Finally, the plaintiffs have failed to adequately inform Harris of their methods of calculating the lost profits from the DNC account. *Santos* is instructive on this point. The defendant in *Santos* sought to preclude the plaintiffs from "presenting evidence at trial of damages that exceed the amount" disclosed at an earlier point in the case. 2008 U.S. Dist. LEXIS 56630, at *2. The court denied the motion because, even though the plaintiffs "neither disclosed a computation of each category of damages claimed nor the evidentiary basis for said damages," the defendants were sufficiently on notice regarding the amount of damages claimed. *Id.* at *4. The action involved a claim against an insurer for breach of an umbrella policy, and the damages sought were the policy's limits. The court concluded that the insurance company would not be "unfairly surprised by evidence of Plaintiffs' damages" and, therefore, found the failure to disclose to be harmless. *Id.* at *5. In making this determination, the court considered the fact that the defendant had participated in an arbitration proceeding with the plaintiffs, and in doing so was "adequately apprised of Plaintiffs' methods for calculating damages." *Id.*

Here, the plaintiffs point to no evidence that Harris is, or should be, aware of the way their lost-profits damages were calculated. MRW claims the "net income" from the DNC account. [Record No. 121-3, p. 2] Yet it has not disclosed the calculations used to reach the dollar figure. This is insufficient to apprise Harris of the basis for the lost-profits claim. In short, the plaintiffs' failure to disclose the lost-profit damages was not harmless.

### ii.   Emotional Damages

The next category of damages concerns the plaintiffs' claim of emotional distress.  The plaintiffs assert that the Court should deny Harris's motion regarding damages for emotional distress and injury to reputation, because those damages "are not subject to ready calculation." [Record No. 128, p. 8 n.29]  They contend that Harris "fails to recognize commentary to the [R]ules and an entire body of case law providing that computation of categories of damages for emotional distress and injury to reputation are considered issues of fact for a jury, as they are not amenable to the kind of calculation disclosure contemplated under the [R]ules."  [*Id.*, p. 2]  The plaintiffs maintain that "district courts have frequently denied motions to compel the computation of such damages because they are difficult to quantify and should be left to a jury." [*Id.*]

Courts have generally recognized that "because emotional suffering is personal and difficult to quantify and because compensatory damages are typically considered a fact issue for the jury, emotional distress damages are not subject to the kind of calculation" required for initial disclosure purposes. *Rosson v. Wyndham Vacation Resorts, Inc.*, No. 3-10-0429, 2011 U.S. Dist. LEXIS 2609, at *2 (M.D. Tenn. Jan. 11, 2011); *see also Bates v. Dura Auto. Sys., Inc.*, No. 1:08-cv-0029, 2011 U.S. Dist. LEXIS 71653, at *28 (M.D. Tenn. July 1, 2011) (finding that plaintiffs had provided the defendant with sufficient damages calculations even though supplemental disclosure did not "contain computations of the plaintiffs' humiliation, emotional distress, and loss of reputation," because "those damages are not susceptible to precise advance calculation"). Because "non-economic damages based on pain and suffering . . . are generally not amenable

to the type of disclosures  contemplated by Rule 26(a)(1)(A)(iii)," Scheel's failure to disclose a number or calculation for such damages was substantially justified.  *Santos*, 2008 U.S. Dist. LEXIS 56630, at *5; *see* Fed. R. Civ. P. 37(c)(1).   In other words, Scheel has provided a "reasonable explanation" for her failure to comply with Rule 26(a)(1)(A)(iii).  *Bessemer*, 596 F.3d at 370.  Therefore, pursuant to Rule 37(c)(1), exclusion of Scheel's emotional damages is not appropriate.  The Court will deny Harris's motion regarding Scheel's claim for damages related to injury to reputation or emotional distress.

### iii.    Punitive Damages

The plaintiffs may also pursue punitive damages.  Punitive damages, like damages for emotional suffering, are not amenable to the requirements of Rule 26(a)(1)(A)(iii).  *Cf. Bates*, 2011 U.S. Dist. LEXIS at *28.  Therefore, MRW's and Scheel's failure to provide a precise number or calculation for their punitive damages claim is substantially justified.  Fed. R. Civ. P. 37(c)(1).  Further, MRW may seek to recover punitive damages even in the absence of a compensatory award.  Kentucky courts have long "held that '[the] correct rule . . . is that if a right of action exists — that is, if the plaintiff has suffered an injury for which compensatory damages might be awarded, although nominal in amount — he may in a proper case recover punitive damages.'"[11] *Lawrence v. Risen*, 598 S.W.2d 474, 476 (Ky. Ct. App. 1980) (alterations in original) (quoting *Louisville & N.R. Co. v. Ritchel*, 147 S.W. 411, 414 (1912)); *see also Commonwealth Dep't of Agric. v. Vinson*, 30 S.W.3d 162, 166 (Ky. 2000) ("The absence of a

---

11      In Kentucky, a plaintiff in a defamation case is generally entitled to at least nominal damages if he or she can establish liability on the part of the defendant.  *See Ray v. Shemwell*, 217 S.W. 351, 353 (Ky. 1919).

showing of actual damages need not bar an award of punitive damages."). Thus, MRW's inability to prove loss of profits at trial does not prevent it from seeking punitive damages. *See Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650, 658-59 (E.D. Ky. 2009) ("Under Kentucky law, an award of compensatory damages is not a prerequisite to an award of punitive damages.").

### B.     Testimony Regarding Tom Koch, Lou Franco, and David McCarty

Harris asks that the Court exclude any

> testimony by Stephanie Scheel or Peggy Ward that Tom Koch, Lou Franco and David McCarty, or anyone else outside of AIPAGIA, may have either seen the ethics complaint or otherwise have knowledge of the ethics complaint and that their relationship with Stephanie Scheel and/or Peggy Ward and/or MRW Holdings Inc., was adversely affected by having seen or having knowledge of the ethics complaint.

[Record No. 113, p. 7]  Harris contends that the plaintiffs did not identify Koch, Franco, or McCarty as a witness, and that "[w]ithout the testimony of those individuals, the testimony of Ms. Scheel and Ms. Ward about what those individuals may have known and what effect it may have had on their relationships is but rank speculation and hearsay."  [*Id.*, p. 9]

The plaintiffs counter that "[s]uch a blanket exclusion is not appropriate."  [Record No. 128, p. 14]  They assert that a witness's statement about whether Koch, Franco, or McCarty saw or heard of the ethics complaint is not hearsay because it will not be offered for the truth of the matter asserted.  "Rather, Plaintiffs intend to rely on those statements to simply demonstrate that the ethics complaint, and the procedure AIPAGIA followed in handling such complaint, did not result in the ethics complaint staying within the small circle that defendants claim."  [*Id.*, p. 15]

Hearsay, which is generally inadmissible at trial, is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove

-17-

the truth of the matter asserted." Fed. R. Evid. 801(c). Without knowing which out-of-court statements will be introduced and for what purpose, the Court cannot exclude all the testimony regarding those out-of-court statements wholesale. The Court will not prohibit the plaintiffs from questioning witnesses about a certain issue for fear that some of the statements concerning that issue might be hearsay. Harris may object at trial to any testimony that violates the hearsay rule. Therefore, the Court will deny Harris's motion *in limine* on this issue.

### C.      Traffic Violation

Finally, Harris asks the Court to exclude any evidence of his arrest in connection with a traffic violation in Shelby County, Kentucky. Harris asserts that there "has been no offer of proof that the arrest resulted in the conviction of a crime punishable by death or by imprisonment of more than a year." [Record No. 113, p. 9] And he correctly points out that such evidence is not admissible to prove his character "in order to show action in conformity therewith," Fed R. Evid. 404(b), or to impeach his testimony at trial. Fed. R. Evid. 609(a). Because the plaintiffs do not object to the exclusion of the arrest, and because it does not appear that the arrest would be relevant to any issue at trial, the Court will grant Harris's request.

### III.

### A.      Motion to Exclude

The plaintiffs seek to exclude the testimony of Harris's expert, Dr. Melissa Baucus.[12] Dr. Baucus's report "focuses on placing the AIPAGIA ethics process in proper context," and it

---

12      The plaintiffs also filed a motion to exclude the expert identified by Harris's co-defendant, Gregg Brooks. [Record No. 110] Because Brooks has been dismissed as a defendant, this motion will be denied as moot.

-18-

concludes that "Harris acted as AIPAGIA encourages its members to do, used the procedures and processes laid out in the organization's bylaws, and provided sufficient evidence to support his concerns." [Record No. 50-1, p. 1]  She also expresses her opinion that Harris "is now experiencing retaliation for reporting his ethical concerns, a fairly common response to whistle-blowers in organizations." [*Id.*]

For evidence to be admissible at trial, it must be relevant.  Fed. R. Evid. 402.  Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action." Fed. R. Evid. 401. With regard to expert testimony, Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The plaintiffs assert that Dr. Baucus's testimony "will not assist the jury to understand the evidence in this case or to determine a fact in issue." [Record No. 109, p. 4]  They object to her discussion of retaliation and whistle-blowing because Harris has not previously alleged that the plaintiffs "retaliated against Harris by filing their lawsuit" and, therefore, the testimony is

-19-

not relevant.  [*Id.*, p. 5]  Additionally, the plaintiffs contend that Dr. Baucus's testimony will not assist the jury in understanding "AIPAGIA's code of ethics, bylaws or the hearing AIPAGIA conducted, . . . since exhaustive testimony from lay witnesses already sufficiently addresses these matters."  [*Id.*, p. 4]

Harris counters that Dr. Baucus's testimony "regarding ethical standards, confidentiality, organizational procedures and due process within AIPAGIA and other organizations" is relevant to the issue of qualified privilege.  [Record No. 131, p. 2]  He contends that her testimony will assist the jury in determining whether the privilege he has asserted was waived for failure to exercise it "'in a reasonable manner and for a proper purpose.'"  [*Id.* (quoting *Tucker v. Kilgore*, 388 S.W.2d 112, 115 (Ky. 1964))]

The plaintiffs concede that "if this Court finds that a question of fact exists as to the issue of waiver," it should "analyze whether it is appropriate for Dr. Baucus to provide testimony." [Record No. 140, p. 2]  And the Court has already found there to be a genuine issue of material fact "regarding whether Harris exceeded the scope of the common interest privilege."  [Record No. 146, p. 24]  Thus, Dr. Baucus's testimony is relevant to the issue of qualified privilege.

The plaintiffs, however, assert that the conclusions in Dr. Baucus's report are not supported by sufficient facts or data because she does not explain why Harris's specific behaviors did not waive the privilege.[13]  [Record No. 140, p. 3]  In other words, the plaintiffs

---

[13]    However, as Harris points out, the plaintiffs have not challenged Dr. Baucus's qualifications as an expert under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

would require Dr. Baucus to opine on an issue reserved to the jury to escape exclusion.[14]  This argument is unpersuasive.  Dr. Baucus's testimony can assist the jury in understanding the background principles of organizational codes of ethics and ethics complaints and, therefore, the context in which a qualified privilege exists, without expressing an opinion concerning the ultimate fact: whether Harris's conduct exceeded the scope of the privilege.  The Court finds that sufficient facts and data appear to support Dr. Baucus's report with respect to the code of ethics and bylaws of AIPAGIA.  Therefore, her testimony is admissible on the issue of qualified privilege.

Additionally, the plaintiffs' contention that Dr. Baucus's testimony would be repetitive of that of certain lay witnesses is not a valid reason for exclusion.  With regard to Harris's asserted defense of qualified privilege, Dr. Baucus's testimony is relevant and admissible. Moreover, a background on the ethical codes of professional organizations and associations will assist the jury to understand the issue of qualified privilege and is therefore appropriate under Rule 702.  Finally, her report was based on sufficient facts as they existed at the time it was filed. [*See* Record No. 131, p. 3 (noting that Dr. Baucus's report was filed before many of the other witnesses' depositions were taken).]  The Court will, however, exclude her testimony regarding retaliation and whistle-blowing, as Harris has failed to show how such evidence would be relevant in light of the fact that he has not asserted a defense or claim based on either theory.

---

14      While opinions are allowed from expert witnesses, "legal conclusions . . . are reserved for the jury." *Hayes v. MTD Prods., Inc.*, 518 F. Supp. 2d 898, 901 (W.D. Ky. 2007).  If, for instance, Dr. Baucus were to "explain why Harris's lack of an investigation into Chris Ward's buy in is excusable," that would essentially be a statement of a legal conclusion — that Harris did not waive the qualified privilege.  [Record No. 140, p. 3]  This would not be permissible.

### B.      Motion to Supplement

Finally, Scheel requests that the Court grant her leave to supplement her expert disclosure. On April 23, 2012, almost three months after the deadline for supplementation under Rule 26(e), Scheel filed a motion seeking to substitute a new expert witness. She indicates that her treating therapist, Carol Ann Maslow, "has encountered personal trauma that will not only make her unavailable for trial, but has also severely limited her ability to cooperate with any prospective testifying expert for Mrs. Scheel." [Record No. 100, p. 1] As a result, Scheel seeks to substitute Dr. Joseph Novello for Ms. Maslow.

Rule 26(a)(2)(A) requires that a party "disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A). These disclosures must be made "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). Under Rule 37(c)(1), a court may exclude a witness if "a party fails to provide information or identify a witness as required by Rule 26(a) or (e) . . . , unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). And "[d]istrict courts have broad discretion to exclude untimely disclosed expert-witness testimony." *Matilla v. S. Ky. Rural Elec. Coop. Corp.*, 240 F. App'x 35, 42 (6th Cir. 2007) (citing *Pride v. BIC Corp.*, 218 F.3d 566, 578-79 (6th Cir. 2000)).

The Court concludes that Scheel's failure was neither harmless nor substantially justified. The plaintiffs' expert disclosures were due on December 5, 2011. [Record No. 25, p. 1] Scheel indicates that from July 2011 to November 2011, her counsel was unsuccessful in contacting Ms. Maslow. Communication was established for the first time since the initiation of discovery on

November 18, 2011.  Counsel then learned that Ms. Maslow's husband had undergone surgery on September 22, 2011, and that she was busy caring for him.  Scheel timely filed her expert witness disclosure on December 5, 2011.  In it, she indicated that Ms. Maslow's "availability to attend trial may be in question," and requested that "the Court provide her with an opportunity for leave to supplement her expert disclosure should the need arise."  [Record No. 39, p. 1]

Although Scheel knew as early as November 18, 2011 that "Ms. Maslow was not confident that she would be available to testify at the trial of this case," her counsel did not locate a new potential expert until February 2012.  [Record No. 100, pp. 3-4]  Scheel's first session with Dr. Novello was on February 29, 2012, five days before the close of discovery.  At no point did Scheel seek an extension of the discovery deadlines to accommodate her search for a new expert witness.  Instead, she waited until the end of April to attempt to supplement her expert disclosure to include Dr. Novello.  Moreover, Scheel indicated that Dr. Novello would "not be able to complete his full written report on Mrs. Scheel until the middle of May[] 2012" [*Id.*, p. 5], even though the deadline for *Daubert* motions was May 7, 2012.  [Record No. 86]  Despite this, Scheel did not request any extension with respect to those motions.  Therefore, the Court finds that Scheel's untimely request is not "substantially justified."  Fed. R. Civ. P. 37(c)(1).

And the plaintiff's failure to timely supplement is not harmless.  An omission is "harmless" if it involves "an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party."  *Vance*, 1999 U.S. App. LEXIS 14943, at *17.  While the Court will assume that Scheel's mistake was honest, she has not shown that she ever made Harris aware of her intention to rely on Dr. Novello as an expert witness, much less that she

-23-

provided such notice before the date for supplementation.  Scheel indicates that on January 31, 2012, her counsel "informed all opposing counsel that Ms. Maslow would not be able to serve as an expert in this case and that counsel for Mrs. Scheel was in the process of retaining an expert and that counsel would move the Court for relief to substitute a new expert." [Record No. 120, p. 3]  However, she did not update Harris about the identity of the new witness or his possible testimony until after the time for supplementation had passed.

Additional factors weigh against granting the Scheel's motion to supplement.  Harris asserts that "he will be substantially prejudiced if this Court allows Plaintiff Scheel to name a new expert witness at this late date in the litigation." [Record No. 103, p. 8]  He points out that discovery will have to be re-opened, and that a new round of *Daubert* motions will be required. This would also potentially result in a need to continue the trial date, which has already been continued once.  Such extensions and continuances would be unfair to Harris, whose reliance on the Scheduling Order was reasonable and justified.  The Court and will deny Scheel's motion for leave to supplement her expert disclosure.  *See, e.g.*, *Potluri v. Yalamanchili*, No. 06-CV-13517-DT, 2008 U.S. Dist. LEXIS 107525, at *6 (E.D. Mich. Nov. 24, 2008) ("[S]upplementation may not be used by a party to ignore court deadlines, reopen discovery, find new facts, [or] generate new expert reports.").

## IV.

The plaintiffs will be permitted to present evidence at trial concerning emotional damages, injury to reputation, and punitive damages.  However, they will be prohibited from presenting evidence relating to lost profits.  The plaintiffs' motion to exclude will be granted

-24-

with respect to Dr. Baucus's testimony on retaliation and whistle-blowing only.  Scheel's motion to supplement will be denied.  Accordingly, it is hereby

   **ORDERED** as follows:

   1.   Defendant Steve Harris's Motion *in Limine* [Record No. 113] is **GRANTED**, in part.  Testimony and proof of either plaintiff's lost-income damages are excluded.  There shall be no mention of an arrest of Defendant Steve Harris in Shelby County, Kentucky.

   2.   Defendant Steve Harris's Motion to Exclude [Record No. 121] is **GRANTED**, in part.  The plaintiffs shall not present evidence regarding the lost-profits damages claim in MRW's First Supplemental Responses to Interrogatories propounded by Defendant.  Scheel's First Supplemental Response is not excluded.

   3.   The plaintiffs' Motion to Exclude Expert Testimony of Dr. Melissa Baucus [Record No. 109] is **GRANTED**, in part.  Dr. Melissa Baucus's testimony regarding retaliation and whistle-blowing is excluded from evidence.

   4.   Plaintiff Stephanie Scheel's Motion for Leave to Supplement Her Expert Disclosure [Record No. 100] is **DENIED**.

   5.   The plaintiffs' Motion to Exclude Expert Testimony of Burke A. Christensen [Record No. 110] is **DENIED** as moot.

   This 6th day of September, 2012.



**Signed By:**

*__Danny C. Reeves__*   DCR

**United States District Judge**

-25-